UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

**CIVIL ACTION NO. 05-362-JBC**

**AKIRA MOTOI,**                                                                 **PLAINTIFF,**

**V.**                 **MEMORANDUM OPINION AND ORDER**

**THE BRISTOL GROUP, INC.,**                                     **DEFENDANT.**

\* \* \* \* \* \* \* \* \* \*

This matter is before the court on the defendant's motion for summary judgment (DE 27). The court, having reviewed the record and being otherwise sufficiently advised, will grant the motion in part and deny it in part.

**I. Factual Background**

This action arises out of the separation of the plaintiff, Akira Motoi, from his employment with the defendant, The Bristol Group, Inc. ("Bristol"). The plaintiff is a citizen of Japan who has spent much of the past fifteen to twenty years working in the United States. The defendant is a design, engineering, and construction firm founded by J. Todd Ball in 1997. Ball is also Bristol's part-owner and President.

The events relevant to this case commenced in late May of 2003, when the plaintiff was released from his employment at the Denham-Blythe Company. A few days later, he met with a Japanese business consultant, Tak Yamada, in the hopes of finding other employment in Kentucky. With Yamada's assistance, the plaintiff prepared a proposal for employment which was then presented to Ball.

After receiving the plaintiff's proposal, Ball met with him and Yamada to

discuss the possibility of his employment at Bristol. At this meeting, the plaintiff was apparently offered a base salary of $40,000 to perform various business marketing services for Bristol. While Bristol did not explicitly promise to pay for his work visa application fees, the plaintiff claims that Ball told him Bristol would "take care" of his visa application. The plaintiff's request for a company car was denied, but Ball did agree to reimburse the plaintiff for his gas mileage. The plaintiff also recalls some discussion of incentive compensation at the meeting. The plaintiff agreed to these terms and began working at Bristol on or about June 18, 2003.

In a letter dated June 18, 2003, Ball confirmed the details of the plaintiff's employment with Bristol. The plaintiff's specific job title was described in the letter as "Business and Marketing Coordinator – Japanese Clients." Bristol's interest in hiring the plaintiff was to maintain and expand upon Bristol's existing business with Japanese clients. The plaintiff's base salary was listed as $40,000 per year, "with incentives that will allow you to earn up to $58,750 annually with review/adjustment annually." The incentive system was described in a table on the following page of the letter. For the plaintiff to be entitled to the minimum level of bonus compensation, he had to generate: (1) project leads for Bristol in the amount of $20,000,000; (2) proposals to Bristol in the amount of $8,000,000; and (3) awarded contracts in the amount of $2,720,000. To reach the next incentive level, he had to achieve $20,000,000 in leads, $10,000,000 in proposals, and $3,300,000 in awarded contracts. The maximum incentive level required him to

2

generate $25,000,000 in leads, $15,000,000 in proposals, and $7,500,000 in awarded contracts. This table stated that incentive compensation could not be earned during the first three months of the plaintiff's employment and that "[t]he goal of [the plaintiff's] position is to expand business opportunities beyond Bristol's current client base. Current prospects list is available." Finally, the plaintiff's offer letter contained a list of the plaintiff's basic job responsibilities.

   Not long after the plaintiff began working at Bristol, Ball received correspondence from the law firm of Greenebaum, Doll, & McDonald ("Greenebaum") regarding the plaintiff's work visa. On June 19, 2003, Greenebaum sent letters to Ball describing the documents it required from Bristol to complete its handling of the matter and estimating the costs of its work. Greenebaum sent further correspondence to Bristol on June 25, 2003, the same day that Bristol sent a check to the Bureau of Citizenship & Immigration Services to cover a petition fee Bristol was required to pay as the plaintiff's employer. Bristol claims that it had no knowledge that the plaintiff had retained Greenebaum's services in connection with his work visa. When Greenebaum's final invoice arrived at Bristol in August of 2003, Ball and Motoi agreed that Bristol would pay Greenebaum's legal fees but would deduct these costs from Motoi's mileage reimbursements.

   The plaintiff worked at Bristol until August 12, 2004. While he was employed at Bristol, the plaintiff was provided with an office where he had a desk

and a telephone but no computer or internet access. His office was apparently somewhat distant from the other employees' offices.

On August 4, 2004, the plaintiff requested his annual salary review. Following a staff meeting on the morning of August 9, 2004, Ball and Josh Marrillia met with the plaintiff for this purpose. At the meeting, Ball produced a spreadsheet entitled "Active Projects and Prospects Generated by Akira Motoi" (hereinafter "Review Spreadsheet") that suggested that the plaintiff had not met the minimum levels necessary to earn any incentive compensation. At this point, the plaintiff allegedly became upset and left the meeting.

Later that day and on August 10, 2004, the plaintiff sent emails to Patricia Dimon, Bristol's director of accounting, detailing his disagreements with Ball's calculation of his entitlement to incentives. Dimon apparently did not respond to these emails. On August 10, 2004, the plaintiff sent an email to Ball regarding a conversation he had had with one of Bristol's business prospects. Ball responded to this email the following day and asked that the plaintiff schedule a time at which the plaintiff, Ball, and Marrillia could meet to discuss any issues left unresolved after their August 9 meeting. The plaintiff responded that day by requesting a meeting at which only he and Ball would be present. The plaintiff sent further emails to Ball on August 11 in which he again expressed his disagreement with Ball's calculations and his desire for a private meeting with Ball. On August 12, 2004, the plaintiff informed Ball that he needed some time to "cool down" and

asked to have that day off from work. Later that day, he requested to have Friday, August 13, 2004, and the following Monday off from work as well. Ball neither explicitly approved nor disapproved of this request but instead asked that the plaintiff meet with him at 8:00 a.m. on August 13, 2004. The plaintiff told Ball he could not meet at that time, and, on the evening of August 12, 2004, Ball terminated the plaintiff's position at Bristol.

The plaintiff later applied for unemployment benefits and eventually prevailed on his claim. After the parties' informal efforts at resolving their dispute proved unsuccessful, the plaintiff filed this action in Fayette Circuit Court on August 10, 2005; the defendant later removed it to this court. The plaintiff alleges claims for breach of contract, breach of fiduciary duty, and discrimination in violation of 42 U.S.C. § 1981.

**II. Standard of Review**

When considering a motion for summary judgment, the Court must determine that there are "no genuine issues as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322 (1986). A court must look beyond the pleadings

and assess the proof to determine whether there is a genuine need for trial. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The significant question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-53 (1986).

### III. Legal Analysis

*A. Breach of Contract*

The plaintiff claims that Bristol breached the parties' contract by denying him the bonus compensation to which he alleges he is entitled. Bristol contends that it did not err in its computation of the plaintiff's incentive credits and that, even if it did, he is still not entitled to any damages as a result of its miscalculations.

In support of its claims, Bristol first asserts that the plaintiff was not entitled to any credit toward his bonus compensation for leads, proposals, and awarded contracts from companies that were existing Bristol clients. The plaintiff responds that, while that may have been Bristol's understanding of the parties' arrangement, the June 18, 2003, offer letter supports his interpretation that he would receive credit for leads, proposals, and awarded contracts for new projects he brought to Bristol, regardless of whether they were from existing clients. The construction, meaning, and legal effect of a written contract are matters of law for the court to decide. *Biber v. Duplicator Sales & Serv., Inc.*, 155 S.W.3d 732, 735 (Ky. Ct.

App. 2004). Absent ambiguity, a written contract is enforced according to its terms, with words being given their ordinary meaning. *Id.* When a contract is susceptible of two meanings, however, it will be construed most strongly against the party who drafted and prepared it. *Perry v. Perry,* 143 S.W.2d 632, 633 (Ky. Ct. App. 2004) (quoting *B. Perini & Sons, Inc. v. Southern Ry. Co.*, 239 S.W.2d 964, 966 (Ky. 1951)).

The parties' contract provides that the plaintiff would be given credit toward his incentive compensation levels for producing leads, proposals, and awarded contracts in excess of certain set dollar figures. These terms, however, were not defined in the June 18, 2003, letter, and their ordinary meanings and usage do not indicate that any project leads, proposals, or contracts had to come from companies who were not Bristol clients to count toward the plaintiff's incentives. Further, while the offer letter states that the "goal" of the plaintiff's employment was to generate business opportunities beyond Bristol's "current client base," the letter did not state that generating leads, proposals, or contracts from new clients was *required* to earn bonuses. The terms "current client base" and "current prospects list" are also undefined, and, as the plaintiff correctly notes, the term "current" is a somewhat amorphous one; what is current at one time may not be current at a later date. Thus, while the offer letter is somewhat ambiguous as to whether the plaintiff could receive credit for bringing projects to Bristol from existing clients, his interpretation of the letter was a reasonable one, particularly in light of the requirement that the letter be construed against Bristol, its drafter.

7

Despite the defendant's arguments to the contrary, the language of the plaintiff's employment contract does not mandate a conclusion that he was barred from earning credits based on projects from clients with whom Bristol had already done business.

The plaintiff also presents evidence that the information Ball relied upon in determining the plaintiff's lack of entitlement to benefits is inaccurate. In their depositions, Ball and Marrillia indicated that Bristol's process for determining who received credit for leads and proposals was somewhat informal. Marrillia even testified that no documentation was kept by Bristol that actively tracked who was awarded credit for a lead or proposal and that entitlement to bonuses was "all subjective to [Ball]." *See* Marrillia Deposition, at 19, 61. Because the defendant has no clear system in place for determining who received credit for leads and proposals, the court is unable to say that the plaintiff did not meet his requirements to earn incentive compensation as a matter of law.

The plaintiff further asserts that he was not given credit for leads that he generated and that the amounts he was credited with receiving were incorrect. The plaintiff made frequent reports to Bristol which indicate his communications regarding leads and proposals for which he was not awarded credit in determining his rights to incentive compensation. In some cases, the plaintiff was not credited for a lead because another entity was given credit for it; in other cases, the alleged lead was simply omitted from the Review Spreadsheet entirely. Bristol responds by noting that Ball and Marrillia both testified that the plaintiff's work was not helpful

in generating leads or proposals with the exception of one project for which he received full credit. While this may be the case, a jury could choose to credit the plaintiff's testimony over that of Ball and Marrillia and to determine that he is entitled to some incentive compensation.

Since the plaintiff has come forward with sufficient evidence to survive the defendant's summary judgment motion on the plaintiff's breach-of-contract claim, the court will deny Bristol's motion as to that claim, Count I of the plaintiff's complaint.

### B. Breach of Fiduciary Duty

For his breach of fiduciary duty claim in Count II of his complaint, the plaintiff seeks "an accounting of profits received by Bristol as a result of his employment, including a full and complete accounting of all funds received and all documents related to those funds." Complaint, ¶ 26. In *Davis v. Siemens Med. Solutions USA, Inc.*, 399 F. Supp. 2d 785 (W.D. Ky. 2005), an employee brought an action against his employer for sales commissions due under the parties' compensation agreement. Among other claims, the plaintiff asserted a cause of action for breach of fiduciary duty against his employer. In resolving that claim, the court noted:

> A fiduciary relationship is one founded on trust or confidence reposed by one person in the integrity and fidelity of another, and that relationship must involve an undertaking in which a duty is created in one person to act *primarily for another's benefit*. . . . Davis has offered no evidence that Siemens had a duty to act primarily for Davis's benefit nor is there evidence that Siemens and Davis were involved in a "joint venture." . . . Davis was a salaried employee who

9

> under certain circumstances was entitled to receive commissions. . . .
> Under the evidence here, the Court concludes that Siemens did not
> assume fiduciary duties with respect to its employment relationship.

*Id.* at 801-02 (citations omitted) (emphasis in original).

The facts of *Siemens* are strikingly similar to the facts of this case; both Motoi and Davis sought the payment of incentive compensation from their employers. Also, Motoi's employment relationship with Bristol was not undertaken "primarily" for his benefit.[1] The court holds that Bristol did not owe the plaintiff any fiduciary duties with respect to the payment of his compensation.

The plaintiff also argues that the defendant takes too broad a view of his claim for breach of fiduciary duty. He claims that, because Bristol was responsible for determining his entitlement to and the amount of his bonuses, it must merely provide him with a complete and accurate accounting of his leads, proposals, and contracts. However, to the extent that the plaintiff believes that Bristol has not been forthcoming in providing information relating to the plaintiff's work at Bristol, this is a discovery matter, not an independent claim for relief. The plaintiff's belief that Bristol has improperly calculated his entitlement to benefits forms the basis of his breach-of-contract claim. The court will grant the defendant's motion for

---

[1] In support of his claim, the plaintiff cites *Steelvest, Inc. v. Scansteel Serv. Ctr.*, 807 S.W.2d 476, 485 (Ky. 1991), which held that a bank may, "in taking a borrower's note and collateral, fall[] under a fiduciary duty to disclose material facts affecting the loan transaction." The plaintiff's employment relationship with Bristol, however, was not the same as that of a bank and a depositor. Bristol did not hold any property of the plaintiff's in trust or for use to lend out to customers. Motoi's claim for disclosure of pertinent information regarding his claim for incentives is therefore distinguishable from the plaintiff's claim in *Steelvest*.

summary judgment as to Count II of the plaintiff's complaint.[2]

### C. § 1981 Discrimination

The plaintiff's final claim is that Bristol discriminated against him in the performance and termination of his contract in violation of 42 U.S.C. § 1981. Section 1981 gives all persons within the United States the same right "to make and enforce contracts . . . as is enjoyed by white citizens . . . ." A plaintiff may establish a claim of discrimination in violation of § 1981 either by introducing direct evidence of discrimination, or by proving circumstantial evidence which would support an inference of discrimination. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000). As the plaintiff has introduced no direct evidence of discrimination against him by Bristol, he must utilize the circumstantial-evidence approach to survive Bristol's motion for summary judgment.

To establish a prima facie case of discrimination under this method, the plaintiff must show that: (1) he is a member of a protected class; (2) he was

---

[2]In his response to the defendant's motion for summary judgment, the plaintiff also notes that Kentucky law implies a covenant of good faith and fair dealing into every contract and that "the failure to provide timely disclosure of the relevant information . . . may thus have been another breach of the contract." Plaintiff's Response, at 30. The court construes this passage as a possible claim that the defendant's purported failure to disclose its calculations regarding the plaintiff's incentive credits breached its duty of good faith and fair dealing. To the extent this is the case, the court must deny the plaintiff's motion to amend its complaint in this matter. A plaintiff may not raise a new claim for the first time in response to a motion for summary judgment. *See Tucker v. Union of Needletrades, Indus., & Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005). Neither the complaint nor discovery conducted in this case alerted Bristol to the fact that the plaintiff may wish to assert such a claim, and he may therefore not do so now.

11

qualified for his job and performed it satisfactorily; (3) despite his qualifications and performance, he suffered an adverse employment action; and (4) he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside his protected class. *Id.* If the plaintiff establishes a prima facie case, then the burden shifts to the defendants to articulate a legitimate, nondiscriminatory reason for the plaintiff's discharge. *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). If the defendant does so, the plaintiff must prove that the proffered reason is actually a pretext to hide unlawful discrimination. *Id.* The plaintiff may show that the reason was pretextual by demonstrating that: (1) the stated reason had no basis in fact; (2) the stated reason was not the actual reason; and (3) the stated reason was insufficient to explain the defendant's action. *Id.*

The parties do not dispute that the plaintiff, a Japanese citizen, is a member of a protected class. While Bristol vigorously denies that Motoi performed his job in a satisfactory manner, the plaintiff's periodic reports and Ball's statements on the plaintiff's unemployment filings to the effect that Motoi was not fired for unsatisfactory job performance at least create triable issues of fact on this point. As to the third prong of the prima facie case, the plaintiff claims that he suffered several adverse employment actions while working for Bristol: (1) the termination of his employment; (2) the withholding of his incentive compensation and mileage reimbursements; (3) the denial of a meaningful performance review; and (4) the allegedly inferior physical facilities in which he worked at Bristol as compared to

those of other employees.

Even if he succeeds on the first three prongs, however, the plaintiff cannot make out a prima facie case with respect to his termination from Bristol. As noted above, the plaintiff must show that his employment was terminated and that he was replaced by a person outside of the protected class. The services once performed by the plaintiff, however, are now performed by Tak Yamada, who is also of Japanese descent. The plaintiff argues that Yamada did not replace the plaintiff and notes that Yamada is an independent contractor, whereas the plaintiff was a Bristol employee. While that may be the case, Yamada's services to Bristol include generating "Japanese contacts" and the "Scope of Work" outlined in Yamada's contract with Bristol virtually mirrors the "Responsibility Summary" attached to the plaintiff's offer letter. Yamada's payment terms are also similar to the plaintiff's; the contract between Yamada and Bristol indicates that Yamada is to be paid additional compensation for producing leads, proposals, and contracts in excess of certain dollar figures. Thus, to the extent that the plaintiff has been replaced at all, his position was filled by another person within the protected class.

Alternatively, a plaintiff may prove a prima facie case by showing that a comparable non-protected person was treated better. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992). To do so, the plaintiff must show that the "comparables" are similarly situated *in all respects*. *Id.* (citing *Stotts v. Memphis Fire Dept.*, 858 F.2d 289 (6th Cir. 1988)) (emphasis in original). This does not mean that a discrimination plaintiff must be similarly situated to his "comparables"

13

in "every single aspect of their employment." *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). Rather, a plaintiff must prove that all of the relevant aspects of his employment situation were nearly identical to those of the non-minority's employment situation. *Id.* (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)).

Although the plaintiff is correct that all of Bristol's employees worked under Ball's supervision, he has failed to show that the "relevant aspects" of his employment were "nearly identical" to that of any other Bristol employee. Aside from Ball and himself, the plaintiff has identified only two other employees who work or once worked for Bristol. These employees are Marrillia, a civil engineer who served as an engineering and sales director, and Patricia Dimon, Bristol's director of accounting. *See* Marrillia Deposition, at 6, 11; Dimon Deposition, at 6-7.

The plaintiff has identified no other Bristol employee who engaged in conduct similar to that for which the plaintiff was terminated, yet was not terminated. The plaintiff does point out that a former employee who was fired for alcoholism received a severance package while he did not. Ball indicated in his deposition, however, that this employee negotiated that package. Bristol Deposition, at 145. The circumstances of and reasons for that person's departure from Bristol are therefore distinct from the plaintiff's.

The plaintiff has also not identified any other employee who brought in the same amount of business that he did but received incentive compensation or a

14

similarly situated employee who received full mileage reimbursements. To be sure, the plaintiff *has* presented a great deal of evidence regarding his entitlement to incentives, and, indeed, the court has already held that he has created a genuine issue of fact as to such entitlement. The issue in his discrimination claim, however, is not whether he was wrongfully denied his benefits but whether he was denied those benefits due to his membership in a protected class. As the plaintiff has not shown he was unfairly discriminated against in relation to his bonus payments, this aspect of his claim must fail.

His claim that he was discriminated against in relation to his mileage reimbursement is flawed for similar reasons. It is undisputed that the plaintiff was denied his mileage reimbursements for a period of time, and it appears that this was never done to another Bristol employee. Bristol engaged in this practice, however, as a means of reimbursing itself for payments it made on the plaintiff's behalf to Greenebaum, an arrangement to which the plaintiff agreed while working at Bristol. The plaintiff has disclosed no other Bristol employee who ever found himself in a similar situation. Even if he had, Bristol's reasons for withholding the plaintiff's reimbursements were financially motivated, and the plaintiff has presented no evidence that this motivation was pretextual.

The plaintiff also claims that he did not receive his contractually required performance review while Marrillia, who is not a member of a protected class, did receive one. He concedes, however, that Ball *did* attempt to review his salary with him before he became upset and left the room. The fact that the plaintiff was

15

displeased with his review does not mean that he was denied it.

Finally, the plaintiff has not shown that an employee with job responsibilities like his own was supplied with better facilities at Bristol than he was.  The plaintiff's job was described as "Business and Marketing Coordinator – Japanese Clients."  As previously noted, the only other Bristol employees at the time of the plaintiff's employment that have been identified to the court are Ball, Marrillia, and Dimon.  Each of these employees had job responsibilities that varied significantly from the plaintiff's.  Further, the plaintiff's job description often required him to be out of the office; even he concedes that "it was expected that he would not be present regularly in the office."  Plaintiff's Response, at 6.  Thus, even if Ball, Dimon, and Marillia could be considered similarly situated employees, Bristol has provided a legitimate non-discriminatory reason (that is, the relative needs of the plaintiff's job) for its different treatment of the plaintiff, and he has presented no evidence to rebut that justification.

The plaintiff has presented proof that he is a member of a protected class and that he suffered some "adverse employment actions" during his time at Bristol. He has failed to show, however, that any of these alleged indignities occurred *because* he is a member of a protected class.  Instead, his job title, responsibilities, compensation, benefits, alleged setbacks, and termination were, in all respects, individualized.  The court will grant the defendant's motion for summary judgment on the plaintiff's § 1981 claim.  Accordingly,

**IT IS ORDERED** that the defendant's motion for summary judgment (DE 27)

16

is **GRANTED IN PART AND DENIED IN PART**.

The defendant's motion is **GRANTED** to the extent that: (1) the plaintiff's breach of fiduciary duty claim and (2) the plaintiff's § 1981 claim are **DISMISSED WITH PREJUDICE**.

The remainder of the defendant's motion is **DENIED**.

Signed on January 10, 2007

*Jennifer B. Coffman*
JENNIFER B. COFFMAN, JUDGE
U.S. DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY

17